In re CROWN FINANCIAL, LTD.,
a North Carolina Corporation,
Debtor.

Bankruptcy No. B–95–10001C–11G.

United States Bankruptcy Court,
M.D. North Carolina,
Greensboro Division.

April 3, 1995.

Kenneth L. Jones, Greensboro, NC, for debtor.

Christine L. Myatt and Amiel J. Rossabi, Greensboro, NC, for movant.

R. Walton McNairy, Greensboro, NC, for Cato.

## ORDER

WILLIAM L. STOCKS, Bankruptcy Judge.

This case came before the court on March 21, 1995, for hearing upon the motion to dismiss filed on behalf of Arnold Eugene Walser and Shirley Turner Walser (the "Walsers") pursuant to § 1112(b) of the Bankruptcy Code. Christine L. Myatt and Amiel J. Rossabi appeared on behalf of the Walsers; Kenneth L. Jones appeared on behalf of the debtor; and R. Walton McNairy appeared on behalf of Marlene H. Cato. Having considered the motion to dismiss, the brief in support of the motion to dismiss, the verified joint response submitted on behalf of the debtor and Marlene H. Cato and the rest of the official court file, and having heard the arguments of counsel, the court finds and concludes as follows:

## FINDINGS OF FACT

1. This case was filed by the debtor on January 2, 1995, as a voluntary Chapter 11 case.

2. The debtor is a North Carolina which formerly was known as Cato Financial, Ltd.

3. The debtor's Chapter 11 petition describes the debtor's business as "Collection of 28 promissory notes from the sale of condominium units."

4. On the date of filing the debtor's assets consisted of one condominium unit valued at $20,000.00, $39.14 in a checking account and 28 promissory notes valued at $500,000.00 "approximately", and a personal computer valued at $500.00.

5. The debtor has one shareholder, Marlene H. Cato ("Mrs. Cato").

6. The debtor has only three creditors. One of these creditors is Mrs. Cato, the sole shareholder, and the other two creditors are the Walsers, who are husband and wife.

7. Prior to 1980 the Woodbridge Apartments were owned by several individuals, including Harlan Cato (the now deceased husband of Marlene H. Cato) and the Walsers. Mr. Cato owned an 86% interest, while the Walsers owned a 10% interest. The remaining interest was owned by persons who no longer are involved with the debtor. In 1980 the owners of the Woodbridge Apartments transferred the apartments to Crown Development Corporation ("Crown"). When the Walsers transferred their interest in the apartments to Crown they received a promissory note dated May 27, 1980 in the principal sum of $192,000.00 from Crown. The Walsers also received 10% of the stock in Crown. Mr. Cato received 86% of the stock in Crown and a promissory note in the principal sum of $1,689,600.00.

8. In 1988 a series of transactions occurred in which Crown was dissolved and its assets and liabilities transferred to the debtor which at that time was named Cato Financial, Ltd. All of the stock of Cato Financial, Ltd. was owned by Mr. Cato. One of the liabilities assumed by the debtor was the $192,000.00 note held by the Walsers. The dissolution of Crown and nearly all subsequent transactions and actions involving Cato

Financial, Ltd. have been the source of great and continuing controversy between the Walsers and the Catos.

9. Harlan Cato died in approximately 1985 and Mrs. Cato succeed to his interest in the debtor and the $1,689,600.00 promissory note from the debtor.

10. Although ownership of Mr. Cato's interest changed, the relationship between the parties did not and the disputes between the Walsers and Mrs. Cato and the debtor continued unabated and undiminished.

11. In 1993 the Walsers filed suit against the debtor in the Superior Court of Guilford County. This suit included a claim to recover on the $192,000.00 promissory note held by the Walsers. The Walsers prevailed on this claim and a judgment against the debtor and in favor of the Walsers was entered on October 4, 1994, in the amount of $245,235.99 plus certain interest, representing the amount adjudged to be due under the promissory note.

12. The debtor gave notice of appeal but did not post an appeal bond. The Walsers caused execution to be issued and undertook to collect on the judgment by having the Sheriff execute on assets of the debtor. The debtor then filed this proceeding.

13. In its schedules the debtor lists Marlene H. Cato as a creditor and shows her as having claims totaling $4,279,609.79. The Walsers are shown as the only other creditors, with a joint claim of $245,235.93.

14. The debtor has no ongoing business operations. The original business plan was to rehabilitate an apartment complex, convert it into condominium units and market the condominium units. This business plan has been fully executed and all of the condominium units sold. The debtor has not acquired other property for development and sale and has no plans to undertake that type of business nor any other type of ongoing business activity. Debtor's sole "business" is to collect the promissory notes and possibly to sell the single condominium unit which it now owns as the result of a foreclosure. Debtor has a single employee, Mrs. Cato, who "manages" the portfolio of notes owned by the debtor. It is not clear what such "management" entails since the debtor has engaged J.I. Kislak Mortgage Corporation to service and actually collect the loans owned by the debtor. Mrs. Cato is paid a salary of $3,000.00 per month, which is the source of further controversy, since the Walsers contend that the debtor has been using its resources to pay unearned salary and payments on her promissory notes while paying nothing on the obligation owned to them. The payments from the debtor to Mrs. Cato during 1994 included $33,000.00 as salary and $142,589.40 on "notes payable."

15. At the time this case was filed and for at least a year prior thereto, the debtor was involved in what amounts to liquidating its assets. This involved receiving proceeds from the obligors on the notes through J.I. Kislak Mortgage Corporation and using the money to make payments to Mrs. Cato and the attorneys defending the suit filed by the Walsers. During this time debtor's only income was passive, consisting of the interest that accrues under the promissory notes. There is no evidence that any of the debtor's resources have been committed to creating any type of business enterprise or undertaking which would produce any kind of product or provide any kind of service or otherwise generate any income or profit on an ongoing basis.

The remaining facts are set forth in the discussion and conclusions which follow.

### DISCUSSION AND CONCLUSIONS OF LAW

■ 16. A voluntary Chapter 11 petition may be dismissed at the very outset of the case if the petition was filed in bad faith.

■ 17. The standard which must be used in deciding whether a Chapter 11 case should be dismissed as a bad faith filing is set forth in *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir.1989). In *Carolin* the Court of Appeals adopted a standard requiring that both objective futility and subjective bad faith be shown in order to warrant dismissals for want of good faith in filing.

■ 18. The principal guidelines to be followed in making the two-pronged inquiry

required by the *Carolin* case are: the court should consider the totality of the circumstances; there is no exhaustive list of factors which should be considered; there is no single factor that will necessarily lead to a finding of bad faith; and the overall aim of the two-pronged inquiry is to determine whether the purposes of the Code would be furthered or advanced by permitting the Chapter 11 petition to proceed past filing.

■ 19. The objective futility inquiry is designed to insure that there is embodied in the petition "some relation to the statutory objective of resuscitating a financially troubled [debtor]." *In re Coastal Cable TV, Inc.*, 709 F.2d 762, 765 (1st Cir.1983). The criteria for making this determination is whether there is any going concern value to preserve on the part of the debtor and any realistic possibility of an effective reorganization.

■ 20. After applying the foregoing criteria in the present case, the court has concluded that objective futility has been shown in this case. This debtor has no ongoing business to protect and no plans to initiate an ongoing business. There being no ongoing business in existence and none on the horizon, there is no going concern value to preserve. Further, there is no realistic possibility of an effective reorganization because there is nothing to reorganize or resuscitate and no plans for anything to reorganize. There are no jobs to save—save one which is hotly disputed—and no business concept or enterprise for the production of income to be preserved. The evidence simply failed to show that this debtor has any potential to emerge from this Chapter 11 proceeding in a rehabilitated condition—that is, ready to carry on with viable business operations. This debtor has been liquidating for some time and has no plans for anything more than continuing on that course. There is no current or potential going concern value associated with this debtor and no suggestion that Chapter 11 could be used to wring any going concern value out of the debtor nor result in the assets being liquidated for any greater return than they could in Chapter 7 or elsewhere. The bottom line is that there is neither going concern value to preserve nor a realistic chance of an effective reorganization

and it would be futile for this debtor to continue in Chapter 11.

■ 21. Under the *Carolin* decision the subjective bad faith inquiry is designed to insure that the petitioner actually intends to use the provisions of Chapter 11 to reorganize or rehabilitate an existing enterprise or preserve going concern value of a viable or existing business. Stated obversely, the aim of this inquiry is to determine whether the petitioner's real motivation is to abuse the reorganization process and to delay creditors without an intent or ability to reorganize the debtor's financial affairs. *Carolin, supra* at 702.

■ 22. In this case, as observed above, the debtor has no going concern value and no ongoing, viable business enterprise to rehabilitate. Therefore, the court concludes that this case was not filed with any actual intent to use the provisions of Chapter 11 to reorganize or rehabilitate any ongoing or planned business enterprise nor to preserve going concern value which is nonexistent. Instead, this case was filed in order to stall and delay the Walsers' efforts to collect on their judgment in the pending state court case. Rather than post an appeal bond the debtor filed this Chapter 11 case knowing and intending that the automatic stay would halt the efforts to execute on the judgment. The debtor in this case seeks breathing room to pursue an appeal to the North Carolina Court of Appeals and not breathing room to deal with business or cash flow problems of the type which bring the good faith Chapter 11 debtor to the bankruptcy court.

23. The motivation behind the filing of this case has to do with the manner in which the assets of the debtor should be divided between the Walsers and Mrs. Cato. The filing has nothing to do with making the pot for creditors larger by preserving going concern value or reorganizing some business operation so that it can generate future profits. Rather, the purpose of the filing was to ensure that Mrs. Cato's share of the pot is larger—assertedly by making sure that her note balance is computed in the same way that the state court computed the Walsers' balance under their note. While it is under-

standable why Mrs. Cato would like to accomplish this purpose, the fact remains that this is not a legitimate purpose for filing for relief under Chapter 11.

24. What has happened in this case is that a bitter, hotly contested controversy has boiled over from the state court into the bankruptcy court. Chapter 11 was not intended to provide an additional forum for the continuation of litigation over what is essentially a two-party dispute. An attempt to do so is an abuse of the bankruptcy process which warrants the dismissal of a Chapter 11 filing. *See In re Donuts of Seekonk,* 122 B.R. 172 (Bankr.D.R.I.1990); *In re Edwards,* 140 B.R. 515 (Bankr.W.D.Mo.1992); *In re Sutton,* 78 B.R. 341 (Bankr.S.D.Fla. 1987). Where a debtor's reorganization effort involves essentially a two-party dispute which can be resolved in state court, and the filing for relief under Chapter 11 is intended to frustrate or delay the legitimate efforts of creditors to enforce their rights against the debtor, dismissal for cause is warranted. *In re Ravick,* 106 B.R. 834, 844 (Bankr.D.N.J. 1989); *In re Panache Development Co., Inc.,* 123 B.R. 929, 932 (Bankr.S.D.Fla.1991).

25. The present case involves a classic two-party dispute which is resolvable in state court. The filing was intended, not for the purpose of corporation reorganization, but to delay and frustrate the efforts of the Walsers to collect on their judgment. Under these and the other circumstances surrounding the filing of this case, the filing must be regarded as one which was not made in good faith.

26. Based upon the totality of the circumstances shown by the evidence both objective futility and subjective bad faith on the part of the debtor have been established.

27. The purpose of the Bankruptcy Code would not be furthered or advanced by permitting the debtor to continue in Chapter 11.

28. Cause exists for the dismissal of this case within the meaning of § 1112(b).

29. The motion to dismiss filed on behalf of the Walsers should be granted and this Chapter 11 case should be dismissed.

Now, therefore, it is ORDERED, ADJUDGED AND DECREED that the motion to dismiss filed by Arnold Eugene Walser and Shirley Turner Walser shall be and the same hereby is granted and this case shall be and the same hereby is dismissed.